# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

IN RE DEPENDENCY OF:         )     No. 68393-4-I
                                     )

P.S.F. (d.o.b. 11/04/2002),      )
                                     )     DIVISION ONE

          Minor Child,       )

STATE OF WASHINGTON       )
DEPARTMENT OF SOCIAL AND    )
HEALTH SERVICES,         )

          Respondent.       )

            v.              )     UNPUBLISHED OPINION

ATIBA FLEMING,          )

          Appellant.        )     FILED: July 22, 2013

SPEARMAN, J. — Atiba Fleming appeals the trial court decision terminating his parental rights. He argues that the Department of Social and Health Services (the Department) failed to offer or provide him with services necessary to correct his parental deficiencies in the foreseeable future, and that the court-appointed special advocate (CASA) for P.F. violated his rights to due process and a fair trial by failing to report P.F.'s wishes to the court, and by failing to speak to him while he was incarcerated in

the King County Jail. We conclude that although the Department failed to offer or provide the necessary services, the evidence supported the trial court's conclusion that such services would not have remedied Fleming's parental deficiencies in the foreseeable future. As such, the trial court did not err in terminating Fleming's parental rights. Because Fleming's other claims are also do not warrant relief, we affirm.

## FACTS

Atiba Fleming and Nikiah Taylor had a son, P.F., on November 4, 2002. Fleming and Taylor lived together, caring for P.F. until he was about three years old. When their relationship ended in 2005, Fleming left the family home and moved between several states, including California, New York, and Florida. Fleming accumulated a history of criminal convictions, including crimes relating to methamphetamine and cocaine use, and domestic violence with Taylor. Fleming did not return to Seattle until February 2009.

Taylor became mentally ill and agreed to a dependency in June 2009. P.F. was cared for first by his maternal grandmother and then his maternal aunt and uncle. At the time, the Department had no information as to Fleming's whereabouts or how to contact him, and later in 2009, an order of dependency as to Fleming was accomplished by publication. The dependency order required Fleming to participate in four services: a parenting assessment and follow the recommendations of that assessment; engage in domestic violence perpetrator's treatment with a state certified program; have a substance abuse evaluation and follow the recommendations that flow therefrom; and undergo random urinalysis two times per week.

2

At the time the dependency was entered as to Taylor, Fleming had not seen his son for more than three years. Although Fleming knew that P.F.'s mother had become mentally ill in June 2009 and that P.F. was living with maternal grandparents, he never sought custody of P.F. When the Department finally learned Fleming's address in January 2011, Fleming had seen his son only twice since leaving in 2005: during Christmas in 2009, and during one happenstance meeting at a park in the summer of 2010. According to Fleming, he attempted to maintain contact with P.F. through phone calls and by sending him items such as clothing from time to time. When the Department located Fleming in January 2011, a social worker sent Fleming a letter about the dependency action. The letter, however, did not inform Fleming of the services in which the court had ordered him to participate.

By March or April 2011, Fleming was represented by counsel. Although Fleming acknowledges that at least as of May 27, 2011, his attorney had explained to him the requirement that he participate in court-ordered services, there is no evidence that the Department had provided Fleming with a list of providers of those services. When asked why he hadn't attempted to participate in these services, he responded "I was arrested on June 11th." Verbatim Report of Proceedings (VRP) (08/22/11) at 40. At the time of the termination trial, August 22 and 23, 2011, Fleming had been in the King County jail since his arrest, and had not participated in the court ordered services. After the August 22 and 23 termination trial, the trial court found the Department had not adequately offered or provided Fleming with the court-ordered services. As such, the trial court

3

continued the trial for six months, "to allow time for the father to engage in services." Clerk's Papers at 112. Fleming remained in the King County jail for the next six months, until the trial resumed in February 2012.

After the trial was continued, the Department sent Fleming monthly letters listing the types of services in which he needed to engage. The letters included the social worker, Pauline Duke's, telephone number. None of the letters, however, gave Fleming a referral list of agencies or organizations that provided the services. After Fleming called and wrote to Duke, she contacted the program coordinator at the King County Jail to determine what, if any, services the jail could provide. The program coordinator indicated the jail was unable to provide the court-ordered services. Duke never attempted to determine which, if any, providers could provide services to Fleming while he was in jail.

When the trial resumed, the CASA testified that P.F. enjoyed living with his aunt and uncle. The CASA also testified about what P.F. saw for his future: "[h]e states that he's very happy with the situation that he's currently in" with his aunt and uncle. VRP (02/06/12) at 226. Duke testified that she had, on a monthly basis, sent Fleming letters while he was in the King County Jail informing him of the services required by the dependency order, and providing him with her contact information.

The trial court found the Department had carried its burden of proof and terminated Fleming's parental rights. Fleming appeals.

4

## DISCUSSION

Standard of Review. The United States Constitution protects parental rights as a fundamental liberty interest. Santosky v. Kramer, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). To terminate a parent's rights, the Department must satisfy a two-pronged test. In re Dependency of K.N.J., 171 Wn.2d 568, 576, 257 P.3d 522 (2011). The first prong requires proof of the six factors enumerated in RCW 13.34.180(1):

(a) That the child has been found to be a dependent child;

(b) That the court has entered a dispositional order pursuant to RCW 13.34.130;

(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;

(d) That the services rendered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future; . . . [and]

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

The Department must prove these factors by clear, cogent, and convincing evidence. In re K.N.J., 171 Wn.2d at 576-77. If the Department satisfies the first prong, the court proceeds to the second prong, determining if termination is in the child's best interests. RCW 13.34.190(1)(b). The Department must prove this second prong by a preponderance of the evidence. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010).

5

Continuance. After finding that the Department had not shown it offered or provided Fleming with services necessary to correct his parental deficiencies, the trial court continued the trial for six months "to allow time for the father to engage in services." CP at 112. Fleming argues that after making this finding, the trial court was "required" to dismiss the termination petition. Opening Brief at 13. But he offers no authority in support of this proposition. Fleming appears to argue that had the court proceeded to judgment at that point, dismissal might have been required because the Department had failed to establish a necessary element of its claim, i.e., that it had offered or provided Fleming services capable of remedying his parental deficiencies in the foreseeable future. (See A.B., 168 Wn.2d at 927; In re Welfare of C.S., 168 Wn.2d 51, 56-57, 225 P.3d 953 (2010); Young v. Key Pharm., Inc., 112 Wn.2d 216, 235, 770 P.2d 182 (1989)). But beyond this, Fleming offers no explanation or argument for why it was error for the trial court to continue the trial proceedings so that he would have the opportunity to engage in the needed services. Generally, a trial court's decision whether to continue a case is reviewed for abuse of discretion. State v. Downing, 151 Wn.2d 265, 272-73, 87 P.3d 1169 (2004). Fleming has not argued, nor are we able to discern, any reason to conclude that the trial court's decision to continue the trial under these circumstances was an abuse of its discretion. We reject Fleming's argument on this issue.

Services. Fleming argues that the Department did not properly assess his parental deficiencies and therefore could not offer services specifically tailored to meet

his needs. Specifically, Fleming contends that the parental deficiencies identified by the Department are not supported by any evidence. He asserts that the claimed deficiencies are based on faulty information from maternal relatives and are in place as the basis of the court-ordered services[1] only because the order of dependency was entered by default. We disagree. Fleming's parental deficiencies are clearly identified in the trial court's finding of fact 2.7:

> 6. The father has a history of violence against the mother. He was convicted of 4th Degree Assault-Domestic Violence for his violence against the mother. As part of his judgment and sentence he was ordered to complete Domestic Violence Batterer's Treatment by a State Certified Program. He was also prohibited from possessing non-prescribed drugs or alcohol. A No contact order was issued but expired 2/10/08.
>
> 7. The father has a criminal history. He currently has a warrant out for his arrest for Assault from Seattle Municipal Court. . . . From incidents in 2007, he was convicted of Trespass. . . . and Theft in Seattle Municipal Court. From an incident in October of 2006 he was convicted of Possession of Drug Paraphernalia in Seattle Municipal Court. He plead guilty of Attempted VUSCA-Attempted Possession of Cocaine in April of 2004 in King County Superior Court. As part of his sentence he was required to complete a substance abuse evaluation and follow treatment recommendation and participate in weekly 12 step meetings. In June of 2005 he was ordered to serve 45 days for his use of methamphetamines on 6/21/04, his failure to obtain a drug/alcohol evaluation and his failure to attend 12 step meetings. From an incident in 2004 he was convicted of Residential Burglary in Whatcom County Superior Court.

CP 185-86 (Finding 2.7(6)-(7)) (cause numbers omitted). These findings are unchallenged and are therefore verities on appeal. Keever & Associates, Inc. v. Randalls, 129 Wn. App. 733, 741, 119 P.3d 926 (2005).

---

[1] The court ordered Fleming to participate in four services: to undergo a parenting assessment and follow the recommendations of that assessment; to engage in domestic violence perpetrator's treatment by a state certified program; to have a substance abuse evaluation and follow the recommendations that flow therefrom; and to undergo random urinalysis two times per week.

Fleming next argues the Department failed to prove that it offered or provided him all reasonably available, necessary services capable of correcting his parental deficiencies within the foreseeable future. RCW 13.34.180(1)(d). Generally, if a parent is unwilling or unable to make use of available services, the Department is not obligated to offer other services. In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988). Likewise, the Department is not required to offer or provide services that would be futile. In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001); In re Dependency of P.A.D., 58 Wn. App. 18, 26-27, 792 P.2d 159 (1990); Ramquist, 52 Wn. App. at 861.

The Department did not know Fleming's location from the time the dependency was entered by default in July 2009 until January 2011, and as such, it could not offer him services. Nevertheless, when the Department finally located Fleming in January 2011, it did not offer him services. Rather, a social worker sent Fleming a letter about the dependency action, but the letter did not mention the services in which the court had ordered him to participate. Fleming acknowledges that at least as of May 27, 2011, his attorney had explained to him the requirement that he participate in court-ordered services, id. at 39-40, but the department still had not offered him services. At the time of the termination trial, August 22 and 23, 2011, Fleming had been in the King County jail since June 11. While incarcerated, he had not been offered, nor had he participated, in any court ordered services. The trial court continued the trial to give Fleming time to participate in court-ordered services.

8

The Department does not dispute that it had failed to offer or provide services as of August 23, 2011. The issue here is whether the record shows the Department offered services in the six months between August 2011 and February 2012, when the termination trial resumed. The Department argues it did, pointing to Duke's monthly letters to Fleming while he was in the King County Jail. The letters, standing alone, are inadequate to meet the State's burden to show that it offered Fleming the necessary services. The letters did nothing more than enumerate the services the court had ordered in the dependency; they did not provide specific organizations for Fleming to contact. As Fleming points out, "When the State suggests remedial services to a parent, it has an obligation under RCW 13.34.180(4) to at least provide him or her with a referral list of agencies or organizations which provide the services." In re Welfare of Hall, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983); see also In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). No such referral list was ever provided here.

The Department contends that it did more than just send letters to Fleming, namely, that Duke spoke with the program coordinator at the King County Jail to determine what, if any, services the jail could provide. The Department points out that the program coordinator indicated the jail was unable to provide Fleming the services ordered by the court. But this shows only that the King County Jail was unable to provide services; it does not show that the Department offered services or that the Department made any effort whatsoever to determine whether or which services could be provided to Fleming while he was in custody.

9

The Department appears to argue that because Fleming was incarcerated, it was not possible to provide him with the court ordered services. The Department, however, provided no testimony or evidence to support this argument. There were no declarations that the providers typically used by Department social workers to provide these services were unable to go into the King County Jail and perform. Likewise, there is no evidence in the record documenting what, if any, attempts the social worker made to locate providers that could perform the court ordered services in the jail. The Department may have been able to meet its minimum obligations if it had introduced evidence of failed efforts to locate and secure services while Fleming was incarcerated, but the Department did not offer such evidence here.

The Department's failure to offer or provide the necessary services notwithstanding, termination may still be appropriate if there is evidence in the record from which the trial court could have concluded that such services would not have remedied parental deficiencies "in the 'foreseeable future.'" Hall, 99 Wn.2d at 851 (quoting former RCW 13.34.180(4) (1979)) (this section has been renumbered at RCW 13.34.180(1)(d)). The facts in Hall are very similar to the facts in this case. In Hall, the Department produced "no evidence" that it had offered or provided the father with any training or counseling in parenting skills. Id. at 850. "Neither did the [Department] produce any evidence to show that such services were not reasonably available." Id. The court rejected the Department's argument that a caseworker's generic suggestion to "take courses or read books on parenting" was sufficient, stating that "'merely

informing the [parents] of what was to be corrected for the return of [their child], does not rise to the level of providing reasonable services. . . .'" Id. (quoting In re Jones, 436 N.E.2d 849, 854 (Ind. App. 1982)).

The court nevertheless affirmed the termination because the statute indicates the services to be provided should be able to remedy parental deficiencies "in the "foreseeable future." Hall, 99 Wn.2d at 851 (quoting former RCW 13.34.180(4). Whether a time period qualifies as the "foreseeable future" varies with the child's age. Id. In Hall, the court concluded 8 months was not in the foreseeable future for a four-year-old. Id. at 850-51. Here, P.F. has waited for over 35 months for Fleming to correct his parental deficiencies. The trial court determined that Fleming's parental deficiencies could not be remedied in the foreseeable future and entered the following uncontested findings:

> 2.18   There is little likelihood that conditions will be remedied so that [P.F.] can be returned to his father within the near future.
>
> 2.19   [P.F.] has waited too long for his father to engage in services. [P.F.] has waited over 35 months for his father to correct his parental deficiencies.
>
> 2.20   The length of time prescribed by the legislature to proceed with permanence is indicative of the significant wait this child has endured.
>
> . . .
>
> 2.22   Continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

CP at 187. These uncontested findings are verities on appeal, Keever & Associates, 129 Wn. App. at 74, and they support a conclusion that any services would not have remedied Fleming's deficiencies in the foreseeable future. Hall, 99 Wn.2d at 851. As

such, although the court has concerns about the Department's lack of effort in providing services, we reject Fleming's argument on this issue.

Fleming next cites In re Dependency of J.W., 90 Wn. App. 417, 953 P.2d 104 (1998) for the proposition that a parent's imprisonment "does not in itself justify the termination of his parental rights." Reply Brief at 6. While Fleming is correct, he ignores the very next line written by the court in J.W.: "But the parent's resulting inability to perform his or her parental obligations is certainly relevant to the child's welfare." J.W., 90 Wn. App. at 426. Again, termination is still appropriate if there is evidence in the record from which the trial court could have concluded that such services would not have remedied parental deficiencies "in the 'foreseeable future'". Hall, 99 Wn.2d at 851.

Finally, Fleming contends that the record shows the trial court's findings 2.10 and 2.12, both of which deal with Fleming's lack of participation in court ordered services, are not supported by the record. Fleming's argument is premised on his own testimony about his alleged past participation in programs similar to the court-ordered services. For example, he testified that he completed a domestic violence training in 2005 or 2006, that he had a drug and alcohol evaluation after his last conviction, and that he had undergone twice-monthly random urinalysis tests in the past. But Fleming's testimony on this issue is so vague as to make it difficult to determine whether the alleged past activities complied with the court ordered services; in at least one case, it is clear the past activities did not comply: twice-monthly random urinalysis is not the same as twice-weekly tests. Additionally, Fleming offers no argument or authority in support of

his contention that past activity can be used to satisfy the court-ordered services in the order of dependency. Moreover, the trial court heard this testimony from Fleming and rejected it. We likewise reject Fleming's arguments on this issue.

Fair trial. Fleming also argues that his rights to due process and a fair trial were violated because the CASA was required to elicit, and then report to the trial court, the views of P.F. regarding the termination proceeding. Because the CASA did not do so, Fleming asserts, the termination of his parental rights was improper. We disagree.

In a proceeding to terminate parental rights, the trial court must appoint a guardian ad litem or court-appointed special advocate for the child. RCW 13.34.100(1). "A 'court-appointed special advocate' appointed by the court to be the guardian ad litem for the child, or to perform substantially the same duties and functions as a guardian ad litem, shall be deemed to be guardian ad litem for all purposes and uses of this chapter." RCW 13.34.030(10). The CASA's role is to "represent and be an advocate for the best interests of the child." RCW 13.34.105(1)(f). In order to fulfill this role, the CASA must "investigate, collect relevant information about the child's situation, and report to the court factual information regarding the best interests of the child." RCW 13.34.105(1)(a). In addition, the statute requires that the CASA "meet with, interview, or observe the child, depending on the child's age and developmental status, and report to the court any views or positions expressed by the child on issues pending before the court." RCW 13 .34.105(1)(b).

Here, although the CASA personally observed and spoke with P.F. on multiple occasions, she did not interview him regarding his views of the termination proceedings and thus did not report any such views to the trial court. Fleming contends the statute requires that such views be reported by the CASA, and that the termination of his parental rights in the absence of such evidence amounted to a violation of his right to due process and a fair trial. We disagree. "[T]he nature of the process due in parental rights termination proceedings turns on a balancing of the 'three distinct factors' specified in Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)." Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The three factors are: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." Santosky, 455 U.S. at 754. Applying these principles, this court has explained that the due process protections afforded parents in a termination hearing include a strict burden of proof, the right to notice, and an opportunity to be heard and defend. In re Interest of Infant Child Skinner, 97 Wn. App. 108, 114, 982 P.2d 670 (1999); In re Welfare of S.E., 63 Wn. App. 244, 250, 820 P.2d 47 (1991); In re Interest of Darrow, 32 Wn. App. 803, 806, 649 P.2d 858 (1982).

The record here does not reflect a violation of any of these protections, and moreover, nothing in the record shows the CASA violated the statute. Again, RCW 13.34.105(1)(b) requires that the CASA "meet with, interview, or observe the child,

14

depending on the child's age and developmental status, and report to the court any views or positions expressed by the child on issues pending before the court." Here, the CASA met with P.F. multiple times, including three visits in the six months after the trial was continued. During those meetings, the CASA spoke with P.F. about his future and she reported the substance of those conversations to the court in her testimony:

> Q: Okay. At this point, have you spoken to [P.F.] about what he wants to have happen with his future?
>
> A: Yes, I have.
>
> Q: And is it part of your duties as a CASA to report on the child's stated interests, what they want to have happen?
>
> A: Yes, I believe so.
>
> Q: And what does [P.F.] state that he wants for his future?
>
> A: He states that he's very happy with the situation that he's currently in. He enjoys living with [his Aunt and Uncle] Josh and Sandy. He gets very excited at a day care when one of them or both come to pick him up after school. He looks forward to, perhaps, having a baby brother or sister.

VRP (02/06/12) at 226-27.

The CASA thus reported P.F.'s views about his future and possible family situation to the court. This complies with RCW 13.34.105(1)(b), and nothing in the statute requires the CASA to interrogate the child as to preference regarding termination of parental rights. Indeed, it may well have been inadvisable for the CASA to put P.F. in the position of being asked how he felt about his father's behavior, or about how he feels about termination proceedings in general. Questioning P.F. regarding specifics of the legal proceedings about the termination of his father's parental rights not only could cause anxiety, it is wholly unnecessary to accomplish the purpose of "report[ing] to the

15

court any views or positions expressed by the child on issues pending before the court." RCW 13.34.105(1)(b). In short, Fleming's rights to due process and a fair trial were not violated by the CASA declining to specifically ask P.F. about his views regarding the termination proceeding.

Fleming also argues his rights to due process and a fair trial were violated because the CASA did not interview him. Fleming relies on the rules for guardians ad litem, which state that the GAL must "maintain independence, objectivity and the appearance of fairness[,]" GALR 2(b), and that the GAL must "make reasonable efforts to become informed about the facts of the case and to contact all parties." GALR 2(g). Fleming provides scant argument and no citation to authority in support of this argument. His sole complaint appears to be that the CASA provided testimony based on a review of Department reports instead of on an interview with Fleming in the jail. Although the CASA clearly failed in her obligation to contact him, Fleming is unable to show how this failure denied him due process or a fair trial. As we have stated, the due process protections afforded parents in a termination trial include a strict burden of proof, the right to notice, and an opportunity to be heard and defend. Skinner, 97 Wn. App. at 114; S.E., 63 Wn. App. at 250; Darrow, 32 Wn. App. at 806. Fleming has not explained how the CASA's failure to contact him interfered with the Department's burden of proof or his opportunity to be heard and defend. Indeed, Fleming himself testified at the termination trial and was more than able to inform the court of those facts

he considered relevant or important to his position. We reject Fleming's arguments on this issue, and affirm the termination.

Motions to supplement the record on appeal and to strike briefing. The Department moved to supplement the record on appeal with evidence of alleged additional, more recent convictions of Fleming. Fleming opposed the motion, and moved in the alternative to supplement the record with evidence of Fleming's alleged progress in his personal life, including drug treatment. Fleming also moved to strike portions of the Department's briefing referencing other convictions. Given none of evidence of new convictions was before the trial court when it granted the petition to terminate Fleming's parental rights, we deny the motions to supplement. To the extent the Department's briefing contained references to information found only in the proposed supplemental record, we grant the motion to strike.

Affirmed.

WE CONCUR:

_____
Leach, C.J.

_____
Spearman, J.

_____
Appelwick, J.